## NO. 14-4682

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE
## FOURTH CIRCUIT

### UNITED STATES OF AMERICA,

**Plaintiff-Appellee,**

**v.**

### ALFREDO VERGARA-ESCOBAR,

**Defendant-Appellant.**

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

_____

## BRIEF OF APPELLEE
_____

Anthony P. Giorno
**Acting United States Attorney**
**GRAYSON A. HOFFMAN**
**Assistant U.S. Attorney**
**116 North Main Street, Room 130**
**Harrisonburg, Virginia 22802**
**(540) 432-6636**

**Counsel for Appellee**

# **TABLE OF CONTENTS**

**Page No.**

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF SUBJECT MATTER JURISDICTION .................................. 1

STATEMENT OF APPELLATE JURISDICTION ............................................ 1

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE AND FACTS ................................................ 2

SUMMARY OF THE ARGUMENTS ............................................... 11

STANDARDS OF REVIEW ............................................................... 12

ARGUMENT ............................................................................. 13

    I.    THE DISTRICT COURT PROPERLY SENTENCED ESCOBAR
        UNDER THE ENHANCED PENALTY PROVISIONS IN 21 U.S.C.
        §§ 841(b)(1)(A) AND (b)(1)(B) AND DID NOT VIOLATE HIS
        FIFTH AND SIXTH AMENDMENT RIGHTS IN DOING SO
        BECAUSE *ALMENDAREZ-TORRES* REMAINS GOOD LAW AND
        BECAUSE ESCOBAR DID NOT CONTEST THE FACT OF HIS
        PRIOR DRUG FELONY CONVICTION IN THE PROCEEDINGS
        BELOW .

    II.    THE DISTRICT COURT DID NOT ERR AT SENTENCING WHEN
        IT IMPOSED A THREE-LEVEL ENHANCEMENT ON ESCOBAR
        FOR HIS MANAGEMENT ROLE IN THIS CONSPIRACY.

CONCLUSION ........................................................................... 22

CERTIFICATE OF COMPLIANCE ..................................................... 23

CERTIFICATE OF SERVICE ........................................................... 24

# <u>TABLE OF AUTHORITIES</u>

<u>Page No.</u>

## <u>SUPREME COUT CASES</u>

*Alleyne v. United States,* ⸺ U.S. ⸺, 133 S.Ct. 2151 (2013) ............... 13, 15, 16

*Almendarez–Torres v. United States,* 523 U.S. 224 (1998).........1, 11, 13, 14, 15, 16

*Apprendi v. New Jersey,* 530 U.S. 466 (2000)........................................... 14, 15, 16

*Harris v. United States,* 536 U.S. 545 (2002)...........................................15

*McMillan v. Pennsylvania,* 477 U.S. 79 (1986) .......................................15

*Shepard v. United States,* 544 U.S. 13 (2005) ....................................14, 15

*United States v. Booker,* 543 U.S. 220 (2005)..........................................14

*United States v. Olano,* 507 U.S. 725 (1993) ...........................................12

## <u>COURT OF APPEALS CASES</u>

*United States v. Cameron,* 573 F.3d 179 (4th Cir. 2009) ...................................9, 10

*United States v. Cheek*, 415 F.3d 349 (4th Cir. 2005) .................................14, 15, 16

*United States v. Graham,* 711 F.3d 445 (4th Cir.2013)..........................................16

*United States v. Harvey,* 532 F.3d 326 (4th Cir. 2008) ..........................................18

*United States v. Llamas*, 599 F.3d 381 (4th Cir. 2010) ..........................................17

*United States v. McDowell*, 745 F.3d 115 (4th Cir. 2014),…………….. ...13, 15, 16

*United States v. McManus*, 23 F.3d 878 (4th Cir. 1994) …………………..........12

*United States v. Slade,* 631 F.3d 185 (4th Cir. 2011) .................................17, 20, 22

*United States v. Steffen,* 741 F.3d 411 (4th Cir. 2013) ...........................................19

*United States v. White,* 405 F.3d 208 (4th Cir. 2005)…………………... ..........12

*United States v. Harris,* 741 F.3d 1245 (11th Cir. 2014) .................................15, 16

## **FEDERAL STATUTES**

18 U.S.C. § 3231 ..................................................................................................1

18 U.S.C. § 3742 ..................................................................................................1

21 U.S.C. § 841 ....................................................................................................3

21 U.S.C. § 841(a) ...............................................................................................1

21 U.S.C. § 841(a)(1)...........................................................................................2

21 U.S.C. § 841(b)(1)(A)...............................................................1, 2, 11, 13, 16

21 U.S.C. § 841(a)(1)(B) .............................................................................2, 11

21 U.S.C. § 846……………………………………………………………...1, 2

21 U.S.C. § 851(a)(1)…………………………………………………………...3

28 U.S.C. § 1291 ..................................................................................................1

**UNPUBLISHED CASES**

*United States v. Croft,* 533 Fed. Appx. 187 (4th Cir.2013)..................................15


**SENTENCING GUIDELINES**

U.S.S.G. § 3B1.1...............................................................................1, 9, 17

## STATEMENT OF SUBJECT MATTER JURISDICTION

The United States District Court for the Western District of Virginia entered judgment against Alfredo Vergara Escobar on August 29, 2014, after a jury convicted him on March 12, 2014 for violating 21 U.S.C. §§ 846 and 841(a).  J.A. 465. The district court had subject matter jurisdiction over the Federal criminal case under 18 U.S.C. § 3231.

## STATEMENT OF APPELLATE JURISDICTION

Escobar appeals from the district court's final judgment against him.  He timely filed his notice of appeal on August 28, 2014.  J.A. 517.  This Court has jurisdiction to consider the issues in Appellant's brief pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.   **Whether the district court properly sentenced Escobar under the enhanced penalty provision in 21 U.S.C. 841(b)(1)(A) and (b)(1)(B), and without violating his Fifth and Sixth Amendment rights in doing so, because *Almendarez-Torres* remains good law and because Escobar did not contest the fact of his prior drug felony conviction in the proceedings below?**

II.  **Whether the district court properly applied a three-level enhancement pursuant to U.S.S.G. § 3B1.1(b) for Escobar's management role in the conspiracy?**

1

## STATEMENT OF THE CASE AND FACTS

On July 2, 2013, a grand jury for the Western District of Virginia, Harrisonburg Division, returned a single count Indictment charging Alfredo Vergara-Escobar ("Escobar") with knowingly distributing 50 grams or more of a mixture and substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1). J.A. 528.[1] On September 5, 2013, a grand jury returned a First Superseding Indictment charging Escobar and others in Count One, with conspiring to knowingly and intentionally distribute 50 grams or more of actual methamphetamine, and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846; in Count Two with knowingly and intentionally distributing 50 grams or more of actual methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); in Count Three with knowingly and intentionally distributing 5 grams or more of actual methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); and in Count Four with knowingly and intentionally possessing with intent to distribute 5 grams or more of actual methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) . J.A. 11.  On August 15, 2013, the United States Attorney's Office filed an Information

---

[1] References to the Joint Appendix shall be J.A.__." References to the Supplemental Joint Appendix shall be S.J.A.__."

pursuant to 21 U.S.C. § 851(a)(1), notifying Escobar that he was subject to the enhanced penalties under § 841, based on a prior felony drug conviction.[2]  J.A. 4, 528; S.J.A. 581.

Escobar elected to go to trial, and on March 10, 2014, Escobar appeared in the United States District Court, Harrisonburg, Virginia, before the Hon. Michael F. Urbanski for a jury trial.  J.A. 7.  The evidence at the trial established that the members of Escobar's narcotics trafficking conspiracy distributed significant amounts of methamphetamine in the Waynesboro, Virginia area from approximately April of 2012 until the time of Escobar's arrest on December 17, 2012.  J.A. 25-425.  From jail, Escobar continued to orchestrate the movement and sale of methamphetamine outside the jail, as detailed below.  The evidence showed that Escobar and other members of his conspiracy distributed more than 2,000 grams of methamphetamine.  J.A. 494.

---

[2] The § 851 Notice stated that Escobar had a prior felony drug conviction, from October 20, 2006, in the Atlantic County Superior Court, New Jersey, for conspiracy to distribute a controlled and dangerous substance or analog.  S.J.A. 581.  The PSR, paragraph 36, as Escobar correctly notes in his brief, clarified that the conviction was for possession of CDS or analog, with a sentencing date of October 20, 2006.  J.A. 534.  However, because Escobar did not contest the fact that he had been convicted of a prior felony drug offense subjecting him to the enhanced penalties under § 841, the documents establishing that Escobar was convicted under the name Alfredo V. Trinidad, under New Jersey statute 2C:35-10a(1) for a third degree offense, a felony, were not introduced in the proceedings below.

3

In his conspiracy, Escobar had at least four sub-distributors who helped him distribute his methamphetamine; they were (1) Christopher Cooper, (2) Samantha Wallace, (3) Misty Sorrells and (4) Barry Bryant, all of whom eventually pled guilty to federal drug charges, cooperated with law enforcement and testified at trial against Escobar. J.A. 69-160, 161-98, 199-234, 302-66. Escobar had an additional five unindicted conspirators who helped him distribute methamphetamine; these were Santiago LNU ("Santiago"), Amigo LNU ("Amigo"), Raul LNU ("Raul"), Steven Terry("Terry") and Greg Truslow ("Truslow"). J.A. 97, 188, 213, 392-444.

Escobar obtained his methamphetamine from two sources of supply: Santiago and Amigo. J.A. 188, 213. These two individuals separately delivered to Escobar multi-ounce quantities of methamphetamine at his residence, which was a trailer park called Patches Trailer Park in Waynesboro, Virginia. J.A. 85, 180, 188, 211-17, 281, 286, 315. After he received the methamphetamine, Escobar then distributed the methamphetamine to his sub-distributors for redistribution to users and other sub-distributors. Escobar generally distributed his methamphetamine to his sub-distributors "on the front" (without immediate payment, expecting payment later after the sub-distributor had sold the narcotics and collected the money for payment). J.A. 90, 184, 319.

Conspirator Christoper Cooper began working as a sub-distributor for Escobar around April of 2012. J.A. 88. Eventually, Cooper obtained one or two ounces of methamphetamine from Escobar, each transaction, once or twice per week, and then sold the narcotics to Cooper's customers, which consisted of other sub-distributors and users. J.A. 90, 93. Two of Cooper's sub-distributors were Bryant and Truslow; and eventually, as described below, Bryant stepped up and became one of Escobar's sub-distributors. J.A. 97

Escobar gave methamphetamine to Cooper for redistribution on the front, and Cooper repaid Escobar after he had sold the methamphetamine to others. J.A. 90. Cooper and Escobar discussed Cooper's customers and whether the customers liked or disliked Escobar's methamphetamine. *Id.* However, Cooper fell into debt and experienced difficulties repaying Escobar. J.A. 93-94. Eventually, Cooper and Escobar got into an argument about Cooper's growing drug debt to Escobar, and Escobar stopped using Cooper as a sub-distributor. J.A. 183. At that point, Cooper's ex-girlfriend and conspirator, Samantha Wallace, stepped into Cooper's place and began working as a sub-distributor for Escobar. Cooper was eventually arrested on October 3, 2012. J.A. 94.

Wallace was one of Escobar's sub-distributors from August of 2012 until the time of her arrest on October 2, 2012. J.A. 179-86. Escobar distributed methamphetamine on the front to Wallace for redistribution, and then Wallace

5

would repay Escobar after she had sold the methamphetamine. J.A. 184. Escobar eventually distributed three and four ounce quantities of methamphetamine to Wallace, each transaction, approximately once per week, until her arrest. J.A. 185-86.

Misty Sorrels was another member of Escobar's drug trafficking conspiracy. Sorrels personally accompanied Santiago, Escobar's source of supply, when he delivered methamphetamine to Escobar in Waynesboro. J.A. 213. Additionally, on numerous occasions, at Escobar's personal request, Sorrels delivered ounce quantities of methamphetamine to Wallace for further redistribution to her customers. J.A. 222-24.

Codefendant Barry Bryant was another one of Escobar's methamphetamine sub-distributors. Initially, Bryant obtained his methamphetamine from Cooper, who had been obtaining it from Escobar, as detailed above. J.A. 313. However, one day while Bryant was waiting for Cooper to arrive at Cooper's residence, Escobar observed Bryant waiting; Escobar approached Bryant directly and offered to start selling the narcotics directly to Bryant (skipping over Cooper). J.A. 318-19. Bryant agreed and eventually purchased one and two ounce quantities of methamphetamine from Escobar for redistribution, sometimes on the front. J.A. 322. Bryant continued to obtain methamphetamine from Escobar and redistributed it until his arrest on November 27, 2012. J.A. 326.

6

After his arrest, Bryant agreed to cooperate with law enforcement. As part of his cooperation, Bryant performed three controlled methamphetamine transactions with Escobar, each for approximately one ounce of methamphetamine on the front. J.A. 328-47. The controlled transactions occurred in November and December of 2012. *Id.* Law enforcement arrested Escobar while he attempted the third transaction; when Escobar saw the police coming toward him, Escobar tossed the methamphetamine on the ground nearby in hopes of hiding it from the police. J.A. 344, 401. Law enforcement later recovered the methamphetamine. J.A. 262,

Unindicted conspirator and accomplice Steven Terry purchased user amounts of methamphetamine from Escobar before Escobar was arrested. J.A. 398. Terry was eventually arrested on unrelated charges and, as fate would have it, the two came into contact again while in jail. J.A. 399-412. Escobar recruited Terry to help him distribute methamphetamine that had been hidden in a cup somewhere outside of prison before he was arrested. J.A. 402-414; S.J.A. 542-80.

Escobar told Terry that he had methamphetamine stashed in a cup outside of Raul's house in some bushes, and he needed Terry's assistance locating it. *Id.* Terry agreed to help. Terry called his sister (and others), and directed his sister to go to the apartment of Escobar's friend and conspirator, Raul. Terry's sister handed her cell phone to Raul; Escobar took the jailhouse phone from Terry, which allowed Escobar to speak directly to Raul. From inside the jail, Escobar then

guided Raul's steps to the location of the hidden methamphetamine. Next, Escobar directed Raul to give the drugs to Terry's sister, who was to sell the methamphetamine; some of the proceeds from those drug sales were eventually deposited into Terry's jailhouse commissary account. Terry then used the funds in jail to purchase items for Escobar and himself. *Id.*

After Escobar learned that some of his conspirators were cooperating against him, he threatened three of them while in jail. Escobar told Cooper that he had contacted Escobar's brother and, consequently, the people in Mexico had put out a $10,000 hit on Cooper's head. J.A. 114-15. Before a pretrial court appearance, Escobar saw Bryant and told him that he was a "snitch, motherfucker" and he was "going to get" him. J.A. 350. Finally, after he learned that Terry was going to testify against him, Escobar used hand signals in jail to threaten him; jailhouse video which captured this threat was shown at trial, as well. J.A. 415-19.

On March 12, 2015, after a three-day trial, the jury convicted Escobar of conspiring to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine or fifty grams or more of actual methamphetamine (Count One); one count of distributing five grams or more of methamphetamine (Count Two), and two counts of distributing five grams or more of actual methamphetamine (Counts Three and Four). J.A. 465.

8

On June 9, 2014, the United States Probation Office prepared a presentence investigation report ("PSR"), which reflected that Escobar had a total offense level of 39, after enhancements for a leadership role under U.S.S.G. § 3B1.1(b), and obstruction of justice, under U.S.S.G. § 3C1.1. J.A. at 533. The report reflected a criminal history category of II, including the prior New Jersey conviction from Atlantic County Superior Court, for possession of crack cocaine, listed in paragraph 36. J.A. 534. Escobar filed written objections to the presentence report, including an objection to the addition of a three-point enhancement for management role pursuant to U.S.S.G. § 3B1.1(b). J.A. 495-97; 540-41. Escobar did not contest the fact that he had a prior felony drug conviction during the sentencing proceedings. The district court conducted Escobar's sentencing hearing on August 27, 2013. J.A. 468-516. After hearing arguments from the parties, the court determined that the enhancement was appropriately applied to Escobar's guideline calculation. J.A. 495. Specifically, the district court referenced *United States v. Cameron,* 573 Fd.3d 179 (4th Cir. 2009) and noted that Escobar's conduct had met several of the guideline factors set forth in *Cameron* for determining whether a defendant played the role of manager or supervisor. J.A. 495-97. The district court found that Escobar had repeatedly issued specific directions to other members of the conspiracy to deliver methamphetamine to others, and Escobar had recruited accomplices who engaged in conduct in furtherance of the conspiracy.

*Id.*  The court found that "on at least five occasions and plainly, exercise of control, decision making, nature of the participation, the commission of the offense, obviously distributing the drugs, recruitment of accomplices, whether or not he recruited Misty Sorrells, he plainly recruited Stephen Terry to assist and with Stephen Terry, his sister, to assist in getting these drugs dug up, getting these drugs sold and the money put into his account."  J.A. 496.  The court added that it was obvious that "he was making more money in this deal than Misty Sorrells or some of these other folks."  J.A. 496.  The court concluded that regarding the degree or participation of planning and organization of the offense, it was plain that Escobar "was telling Misty Sorrells who to give the drugs to," and that it was plain that "he planned the whole Stephen Terry phone call with Raul to dig up the drugs."  J.A. 496.  The court noted that regarding the nature and scope of the illegal activity, it was plainly drug dealing, and that regarding the degree of control and authority exercised over others, Escobar "told people what to do," and "recruited them." J.A. 496.  On these grounds, the district court ultimately concluded that under the *Cameron* standard, "there was actual control in this case," and that the three-point enhancement was "manifestly supported by the evidence..."  J.A. 496-97.

The district court resolved all other objections to the presentence report, and determined that Escobar had an adjusted offense level of 39, with a criminal history category of II, corresponding to a sentencing guideline range of 292-365

months.  J.A. 481, 497-98.   The court heard the arguments from the parties

regarding the appropriate sentence, and concluded that a sentence of 292 months

was appropriate, but not greater than necessary under the facts and circumstances

of the case.  J.A. 511.

## SUMMARY OF THE ARGUMENTS

I.  In its *Almendarez-Torres* decision in 1998, the Supreme Court held that the

Constitution does not require the government to include in the indictment the

fact of a prior conviction, and that the Sixth Amendment permits a judge to

find the fact of a prior conviction by a mere preponderance of the evidence,

even if the fact of the prior conviction increases the statutory maximum or

minimum mandatory penalty for the current offense.  523 U.S. 224 (1998).

*Almendarez-Torres* remains good law and unless and until the Supreme

Court holds otherwise, this Court is bound by that decision.  Escobar did not

contest below that he had been convicted of a prior drug felony, and that he

was thus subject to the enhanced penalties as set forth in 21 U.S.C. §§

841(b)(1)(A) and (b)(1)(B). The district court properly found at sentencing

that Escobar was subject to those enhanced penalties and sentenced him

accordingly, in light of the *Almendarez-Torres* exception for the fact of a

prior conviction.

11

II. When the district court sentenced the defendant, it properly applied the three-point management enhancement because the district court found that the defendant had exercised control over other members of the conspiracy and had recruited accomplices, as well.

## STANDARDS OF REVIEW

I. When, as here, a criminal defendant raises a constitutional issue for the first time on appeal, the reviewing court applies a "plain error" standard of review. *United States v. Olano,* 507 U.S. 725, 731-32 (1993); *United States v. White,* 405 F.3d 208, 215 (4th Cir.2005). To establish "plain error," the defendant must show that (1) an error occurred, (2) the error was plain, and (3) the error affected his substantial rights. *Olano,* 507 U.S. at 732-35; *White,* 405 F.3d at 215.

II. A district court's application of three-level enhancement for manager or supervisor role is reviewed for clear error on appeal. *United States v. McManus*, 23 F.3d 878, 882 (4th Cir. 1994).

## ARGUMENT

**I.   THE DISTRICT COURT PROPERLY SENTENCED ESCOBAR UNDER THE ENHANCED PENALTY PROVISIONS IN 21 U.S.C. §§ 841(b)(1)(A) AND (b)(1)(B) AND DID NOT VIOLATE HIS FIFTH AND SIXTH AMENDMENT RIGHTS IN DOING SO BECAUSE *ALMENDAREZ-TORRES* REMAINS GOOD LAW AND BECAUSE ESCOBAR DID NOT CONTEST THE FACT OF HIS PRIOR DRUG FELONY CONVICTION IN THE PROCEEDINGS BELOW .**

Escobar argues that the district court violated his Fifth and Sixth Amendment rights when it "raised the statutory minimum mandatory penalty from ten years to twenty years after finding by a preponderance of the evidence that he had a prior conviction for simple drug possession."  Br. of Appellant at 10. Escobar essentially challenges the viability of *Almendarez–Torres v. United States,* 523 U.S. 224 (1998), in light of the Supreme Court's recent decision in *Alleyne v. United States,* —— U.S. ——, 133 S.Ct. 2151 (2013).  For the reasons that follow, Escobar's claim is without merit and his appeal in this regard should be denied. In 1998, the Supreme Court held that the Constitution does not require the government to include in the indictment the fact of a prior conviction, and that the Sixth Amendment permits a judge to find the fact of a prior conviction by a mere preponderance of the evidence, even if the fact of the prior conviction increases the statutory maximum or minimum mandatory penalty for the current offense. *Almendarez–Torres v. United States,* 523 U.S. 224, 226, 247 (1998); *United States v. McDowell*, 745 F.3d 115, 123 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 942

(2015).  In *Apprendi v. New Jersey,* 530 U.S. 466, 489 (2000), the Supreme Court

held that "[o]ther than the fact of a prior conviction, any fact that increases the

penalty for a crime beyond the prescribed statutory maximum must be submitted to

a jury, and proved beyond a reasonable doubt."   In reaching its decision, the Court

reaffirmed its holding in *Almendarez-Torres.  United States v. Cheek*, 415 F.3d

349, 352 (4th Cir. 2005).  The *Apprendi* Court described the *Almendarez–Torres*

holding as "at best an exceptional departure" from the normal Sixth Amendment

rule, and justified this "departure" on the ground that the defendant in *Almendarez–*

*Torres* did not challenge the accuracy of the prior conviction and that the prior

conviction arose "pursuant to proceedings with substantial procedural safeguards

of their own." *Apprendi*, 530 U.S. at 487-88.  The Court concluded that these

protections "mitigated the due process and Sixth Amendment concerns otherwise

implicated in allowing a judge to determine a 'fact' increasing punishment beyond

the maximum of the statutory range." *Id.*  Four Justices dissented in *Almendarez–*

*Torres*, and in 2005, Justice Thomas, who voted with the majority in *Almendarez–*

*Torres,* stated that he believes *Almendarez-Torres* was wrongly decided. *See*

*Shepard v. United States,* 544 U.S. 13, 28 (2005) (Thomas, J., concurring).  In the

same year, however, the Supreme Court again reaffirmed the *Almendarez-Torres*

exception for recidivism-based enhancements. *See United States v. Booker,* 543

U.S. 220 (2005) (reaffirming *Apprendi* and incorporating the *Almendarez-Torres*

14

recidivism exception); *cf. Shepard,* 544 U.S. 13 (addressing the scope of the recidivism exception); *Cheek,* 415 F.3d at 352.

In *Harris v. United States,* 536 U.S. 545 (2002) and *McMillan v. Pennsylvania,* 477 U.S. 79 (1986), the Supreme Court held that facts increasing a mandatory minimum sentence could be decided by a judge at sentencing rather than a jury.  *Id.* at 563–65.  But in 2013, in its decision in *Alleyne v. United States*, 133 S.Ct. 2151 (2013), the Court overruled both *Harris* and *McMillan* and held that such facts are instead elements that "must be submitted to the jury and found beyond a reasonable doubt." 133 S.Ct. at 2158.  However, *Alleyne* did not disturb *Almendarez–Torres v. United States,* 523 U.S. 224 (1998). *United States v. Croft,* 533 Fed. Appx. 187, 188 (4th Cir. 2013) (unpublished) (finding *Alleyne* of no aid to defendant who challenged the increase of his mandatory minimum sentence based on his status as an armed career criminal, which was based on the district court's finding of defendant's prior convictions by a preponderance of the evidence).  With regard to *Almendarez–Torres,* the *Alleyne* Court said: "Because the parties do not contest [*Almendarez–Torres*]'s vitality, we do not revisit…it for purposes of our decision today." *Alleyne*, 133 S.Ct. at 2160 n. 1.

In light of the above, there appears to be no question that there is tension between the Court's decisions in *Alleyne* and *Almendarez-Torres*.  *McDowell*, 745 F.3d 123-24 ("[T]he Supreme Court's recent characterizations of the Sixth

15

Amendment are difficult, if not impossible, to reconcile with *Almendarez-Torres's* lonely exception to Sixth Amendment protections."); *United States v. Harris,* 741 F.3d 1245, 1250 (11th Cir. 2014)("We recognize that there is some tension between *Almendarez-Torres* on the one hand and *Alleyne* and *Apprendi* on the other."); *see also Apprendi,* 530 U.S. at 489 ("[I]t is arguable that *Almendarez–Torres* was incorrectly decided."). Nonetheless, *Almendarez-Torres* remains good law, and this Court "may not disregard it unless and until the Supreme Court holds to the contrary." *McDowell*, 745 F.3d at 124; *Harris*, 741 F.3d at 1250.

Because *Almendarez-Torres* remains good law, the district court properly sentenced Escobar in accordance with the enhanced penalty provisions of 21 U.S.C. §§ 841(b)(1)(A) and (b)(1)(B), and where Escobar did not contest the fact of his prior felony drug conviction in the proceedings below. Escobar's arguments that *Almendarez-Torres* is not binding on this Court regarding the application of minimum statutory penalties are simply not supported by the law of this Circuit and the Supreme Court, and his challenges to the viability of *Almendarez-Torres* must fail in light of those precedents. *See McDowell*, 745 F.3d at 124; *United States v. Graham,* 711 F.3d 445, 455 (4th Cir.2013); *see also Alleyne,* 133 S.Ct. at 2160 n. 1 (2013); *Cheek,* 415 F.3d at 354. For all these reasons, the district court did not err in sentencing Escobar under the enhanced penalty provisions, and Escobar's appeal should be denied.

## II. THE DISTRICT COURT DID NOT ERR WHEN AT SENTENCING IT APPLIED THE THREE-LEVEL ENHANCEMENT FOR ESCOBAR'S ROLE IN THE CONSPIRACY AS A MANAGER OR SUPERVISOR BECAUSE HE EXERCISED CONTROL OVER OTHER MEMBERS OF THE CONSPIRACY AND HE RECRUITED OTHERS.

Section 3B1.1(b) of the United States Sentencing Guidelines provides a three-level enhancement if "the defendant was a manager or supervisor (but not an organizer or leader), and the criminal activity involved five or more participants or was otherwise extensive." Comment note 4 under section 3B1.1(b) identifies seven factors courts must consider in deciding whether to apply this enhancement: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning and organizing the offense; (6) nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others.

To qualify for this enhancement, a defendant must have "exercised some authority over other participants in the operation." *United States v. Slade*, 631 F.3d 185, 190 (4th Cir. 2011). In a drug conspiracy, for example, the defendant must have done more than simply buy or sell narcotics. *Id.* There must be some evidence that the defendant exercised management responsibility over people and controlled the activities of others. *United States v. Llamas*, 599 F.3d 381 (4th Cir. 2010). As the proponent of the enhancement, the government bears the burden of

17

proving applicable facts by a preponderance of the evidence.  *United States v. Harvey*, 532 F.3d 326, 337 (4th Cir. 2008).

In this case, the district court did not err at sentencing when it applied a three-level enhancement for Escobar's role as a manager or supervisor in the conspiracy.  As the trial court found at sentencing and the presentence report explained, Escobar exercised control over other members of the conspiracy.  J.A. 467-516, 532.  Specifically, the district court pointed to numerous occasions when Escobar directly instructed one member of the conspiracy to deliver ounce-level quantities of methamphetamine to another.  J.A. 495-97.  Importantly, the district court also highlighted that Escobar had recruited accomplices, like Steven Terry, to engage in conduct in furtherance of the conspiracy.  *Id.*   As such, the trial court properly concluded that Escobar was a manager or supervisor in his conspiracy.

The evidence introduced at trial and sentencing showed that Escobar indeed exercised control over other members of the conspiracy.  For example, on numerous occasions, Escobar directed conspirator Sorrells to deliver methamphetamine to Wallace for subsequent redistribution to others.  J.A. 222-24.  Additionally, as explained above, while he was in jail Escobar orchestrated additional drug trafficking that took place outside the jail.  Specifically, Escobar recruited fellow inmate Terry to help Escobar and his associate, Raul, who was not

18

in jail, locate and distribute the twenty-two ounces of methamphetamine hidden outside of jail near Raul's house.  J.A. 403-412; S.J.A. 542-80.

Additionally, Escobar recruited both Bryant and Terry to perform conduct in furtherance of the conspiracy.  While Bryant was waiting for Cooper to arrive and make a drug transaction one day at Patches Trailer Park, Escobar approached Bryant before Cooper arrived; the two ultimately entered into an agreement whereby Bryant would begin obtaining his methamphetamine directly from Escobar, which removed Cooper from the equation.  J.A. 402-14.  Escobar also recruited Steven Terry.  After Escobar was arrested, he recruited Terry inside the jail to help Escobar procure the hidden methamphetamine outside the jail, as detailed above.  Escobar then directed Raul, another associate outside of the jail, to give the methamphetamine to Terry's sister for resale.  J.A. 403-422; S.J.A. 542-80.

In *United States v. Steffen*, 741 F.3d 411 (4th Cir. 2013) this Court upheld the application of a three-level enhancement for the defendant's management role in the conspiracy.  One of the facts the Court found relevant to its decision was the defendant's effort to conceal his criminal conduct behind other members of the conspiracy.  In *Steffen*, the defendant transferred an electric bill out of his own name into that of another conspirator to avoid detection by law enforcement.  *Id*. at

19

416. The Court explained that this act "reflected an exercise of authority over [the conspirator] and a management decision regarding which co-conspirator should be assigned a particular task and exposure for the crime." *Id*. at 416.

Escobar engaged in similar conduct in this case. As discussed above, after he was arrested and being held in custody, Escobar recruited fellow inmate Terry to contact Terry's sister, who then contacted Raul, Escobar's conspirator outside of jail, to help Escobar locate and distribute the twenty-two grams of methamphetamine hidden near Raul's house. J.A. 402-14; S.J.A. 542-80. Escobar could have contacted Raul directly himself, but he chose not to do so to avoid detection by law enforcement. Most jails record inmate calls, so Escobar had Terry contact Raul, through Terry's sister, using Terry's jailhouse phone account instead of using his own, in an attempt to limit his own criminal exposure.

Escobar insists that he did not play a management or supervisory role in the conspiracy, and instead merely engaged in a variety of buyer-seller relationships with his conspirators. Br. of Appellant at 23-29. Escobar relies upon this Court's decision in *Slade*, br. of Appellant at 24, but this case is distinguishable from *Slade*. In *Slade*, this Court had reversed the trial court's decision to apply the three-level enhancement for Slade's leadership role in his conspiracy because the only facts related to Slade's leadership role were that he distributed narcotics to

20

other members of the conspiracy for resale, and unindicted conspirators drove him to different locations to deliver narcotics to his customers.  631 F.3d 185, 190-92. The facts in Escobar's case, by contrast, are different.

Here, Escobar directed specific conduct by other members of the conspiracy, and he also recruited accomplices who helped him commit crimes in furtherance of the conspiracy.  For example, from jail Escobar had Terry contact Terry's sister and Raul, one of Escobar's associates outside of the jail, and then Escobar orchestrated the locating and movement of twenty-two grams of methamphetamine on the outside of the jail as described above.  J.A. 402-14; S.J.A. 542-80.  Escobar also coordinated these activities to limit his own criminal exposure, and to enjoy eventually the use of those drug sale proceeds while he was in jail.

Additionally, Escobar directed conspirator Sorrels on numerous occasions to deliver some of his methamphetamine to conspirators Wallace and Cooper for subsequent distribution to others.  J.A. 222-24.  Escobar also gave his sub-distributors methamphetamine on the front, and later collected the proceeds from the sales only after they had first sold the narcotics.  *See, e.g.,* J.A. 90, 184, 321.

Escobar also recruited Terry and Bryant to take action in furtherance of his conspiracy; Terry assisted with the jailhouse coordination activities described above, and Bryant distributed one or two ounces of methamphetamine per week for

Escobar over a period of months before Bryant was arrested.  All of these facts set this case apart from *Slade*, and clearly demonstrate that Escobar played a management role in his conspiracy worthy of the three-level enhancement applied by the trial court at sentencing.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court reject Appellant's arguments and affirm the judgments of the district court.

Respectfully submitted,

ANTHONY P. GIORNO
Acting United States Attorney

s/ Grayson A. Hoffman
Assistant U.S. Attorney
U.S. Attorney's Office
116 North Main Street, Room 130
Harrisonburg, Virginia 22801
VA Bar No. 73726

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,866 excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, 14 point Times New Roman font, using Microsoft Word 2010.

s/ Grayson A. Hoffman
Assistant U.S. Attorney
VA Bar No. 73726

23

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2015, I caused the foregoing Brief of

Appellee to be electronically filed with the Clerk of the Court using the CM/ECF

System, which will send notice, and constitute service, of such filing to the

following registered CM/ECF user(s):  Charles M. Henter, Counsel for Appellant.

s/ Grayson A. Hoffman
Assistant U.S. Attorney
VA Bar No. 73726